**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| TYRONE ADDERLEY, KIRK BOUFFARD, CHAZ BROWN, BEN DEFOREST, FIX YOUR PLACE LIMITED, RYAN GIUNTA, ERIK H. GORDON, M101 GROUP II LLC, PEOPLE FIRST (BAHAMAS) LTD., PRESTON RIDEOUT, JASON ROLLE, TILE KING ENTERPRISES LIMITED, and YOUNG DIGERATI, | Index No.: 15-CV-9935 |
| Plaintiffs, | |
| -against- | **COMPLAINT** |
| | **JURY TRIAL DEMANDED** |
| JAMES T. DINGMAN, BAHAMEX LTD., OUT WEST HOSPITALITY LTD., ISLAND SMOKE HOUSE LTD., and THE TRAVELLER'S RESTAURANT LTD., | |
| Defendants. | |

Plaintiffs Tyrone Adderley ("Adderley"), Kirk Bouffard ("Bouffard"), Chaz Brown ("Brown"), Ben DeForest ("DeForest"), Fix Your Place Limited ("FYP"), Ryan Giunta ("Giunta"), Erik H. Gordon ("Gordon"), M101 Group II LLC, People First (Bahamas) Ltd. ("People First"), Preston Rideout ("Rideout"), Jason Rolle ("Rolle"), Tile King Enterprises Limited ("Tile King"), and Young Digerati ("YNG Group" and collectively, the "Plaintiffs"), by their undersigned attorneys, for their complaint against Defendants James T. Dingman, BahaMex Ltd., Out West Hospitality Ltd., Island Smoke House Restaurant Ltd., and Traveller's Beach Restaurant Ltd. ( the "Defendants") allege as follows:

## NATURE OF ACTION

1.    This case arises out of Defendants' scheme to defraud investors and steal money and services in connection with the development of a hospitality business in the Bahamas.

2.      Defendant James T. Dingman ("Dingman") is a child of wealth and privilege. Dingman's grandfather, James E. Dingman, was vice chairman of AT&T.  Dingman's father, Michael D. Dingman, is an investment banker who renounced his U.S. citizenship in 1995 and relocated his family to the Bahamas.

3.      In or around late 2012, after working for businesses owned or controlled by his father, Dingman set out to build his own empire.  He announced plans to establish a Bahamian hospitality conglomerate that would own and operate a network of restaurants, bars, hotels, and other venues.

4.      From December 2012 through September 2013, Dingman registered six new companies to conduct business in the Bahamas.  Five of those companies, including Defendants BahaMex Ltd. ("BahaMex"), Island Smoke House Restaurant Ltd. ("Island Smoke House"), and the Traveller's Beach Restaurant Ltd. ("Traveller's"), were intended to operate restaurants. Defendant Out West Hospitality Ltd. ("Out West Hospitality," or the "Company") was formed as a holding company for the restaurants, bars, hotels and other businesses.

5.      To fund the development of these businesses, Dingman exploited the Dingman family name and social connections.  Dingman solicited investments from U.S. citizens located in New York and elsewhere.

6.      In his communications with U.S. investors, Dingman repeatedly lied about where their money was going and what they would receive in return.  Indeed, Dingman promised investors ownership interests in Out West Hospitality that exceeded 100 percent of the Company's equity.  However, no one but Dingman and his agents ever received any stock.

7.     Upon information and belief, instead of using all the capital he raised to develop the hospitality business, Dingman spent some of the funds to support his lavish lifestyle, which included luxury travel and recreational drugs.

8.     Dingman also repeatedly lied to vendors and employees in the Bahamas. Dingman falsely promised payments for past-due and future invoices in order to induce vendors and employees to continue to provide Out West Hospitality and its purported subsidiaries with services and supplies.

9.     By fall 2013, Dingman and Out West Hospitality had defaulted on their payroll, vendor, and rent obligations.  Employees quit, service providers stopped performing, and landlords terminated leases.  By August 2014, not a single one of Out West Hospitality's restaurants, hotels and other businesses was operational.

10.     In order to keep his investors from learning of his failures, Dingman used his various corporate entities interchangeably, failed to maintain separate books and records and, in his own words, operated a "[P]eter paying [P]aul situation."

11.     Ultimately, creditors, investors, and staff learned their payments were not – as Dingman had claimed – delayed due to travel schedules, banking technicalities, liquidity issues, or the challenges of doing business in the Bahamas.  When Dingman's victims finally understood that Dingman never intended to pay them at all and began to demand answers, Dingman stopped answering their phone calls, stopped returning their email messages, and eventually fled the Bahamas altogether, hiding out in his girlfriend's apartment in downtown New York City.

12.     Through this action, Plaintiffs seek to hold Dingman and his companies responsible for their false promises, lies, and failures to honor their financial obligations.

3

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 as the

First Claim for Relief arises under the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b).

Subject matter jurisdiction over the Second through Sixth Claims for Relief also exists pursuant

to 28 U.S.C. § 1367 because those claims for relief are so related to the First Claim for Relief as

to form part of the same case or controversy.

14.     This Court has personal jurisdiction over all of the Defendants under New York's

long arm statute, C.P.L.R. § 302 and Federal Rule of Civil Procedure 4.

15.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2)

because a substantial part of the events or omissions giving rise to the claim occurred in the

Southern District of New York, or in the alternative, pursuant to 28 U.S.C. § 1391(b)(3).

## THE PARTIES

16.     Plaintiff Adderley is an individual residing in Nassau, Bahamas.

17.     Plaintiff Bouffard is an individual residing in Singapore with a primary residence

in the state of Florida.

18.     Plaintiff Brown is an individual residing in the State of New York.

19.     Plaintiff Ben DeForest is an individual residing in the State of Massachusetts.

20.     Plaintiff FYP is a limited liability company organized and existing under the laws

of the Commonwealth of the Bahamas with a principal place of business in Nassau, Bahamas.

21.     Plaintiff Giunta is an individual residing in the State of Florida.

22.     Plaintiff Gordon is an individual residing in the State of Florida.

23.     Plaintiff M101 Group II LLC is a limited liability company organized and

existing under the laws of the State of Florida.

24.     Plaintiff People First is a corporation organized and existing under the laws of the Commonwealth of the Bahamas with a principal place of business in Nassau, Bahamas.

25.     Plaintiff Rideout is an individual residing in the State of Nevada.

26.     Plaintiff Rolle is an individual residing in Nassau, Bahamas.

27.     Plaintiff Tile King is a corporation organized and existing under the laws of the Commonwealth of the Bahamas with a principal place of business in Nassau, Bahamas.

28.     Plaintiff YNG Group is a corporation organized and existing under the laws of the Commonwealth of the Bahamas with a principal place of business in Nassau, Bahamas.

29.     Defendant Jaime Dingman is the founder and principal of Out West Hospitality, BahaMex, the Island Smoke House, and Traveller's.  Upon information and belief, Dingman resides in New York, New York.

30.     Defendant BahaMex Ltd. is a corporation organized and existing under the laws of the Commonwealth of the Bahamas with a principal place of business in Nassau, Bahamas

31.     Defendant Out West Hospitality is a corporation organized and existing under the laws of the Commonwealth of the Bahamas with a principal place of business in Nassau, Bahamas.

32.     Defendant Island Smoke House is a corporation organized and existing under the laws of the Commonwealth of the Bahamas with a principal place of business in Nassau, Bahamas.

33.     Defendant Traveller's is a corporation organized and existing under the laws of the Commonwealth of the Bahamas with a principal place of business in Nassau, Bahamas.

## THE FACTS

### *Creation of Out West Hospitality*

34.     Between December 18, 2012 and September 6, 2013, Dingman, through his attorneys at the Bahamas-based law firm of Graham Thompson, registered at least six limited-liability companies to operate as restaurants and/or bars in Nassau, Bahamas, including BahaMex Ltd., 25 North Ltd., Traveller's Beach Restaurant Ltd., the Island Smoke House Ltd., Galley Sports Bar Ltd., and the Daiquiri Factory Ltd.

35.     On September 6, 2013, Dingman incorporated Out West Hospitality Ltd., to serve as a parent company.

36.     Upon information and belief, at all relevant times, Out West Hospitality was owned exclusively by two nominal shareholders – Grahamco Limited ("Grahamco") and Nomco Limited ("Nomco").

37.     Upon information and belief, Grahamco and Nomco are nominee companies set up by Graham Thompson for the sole benefit of Dingman.

### *Building the Out West Hospitality Team*

38.     Plaintiff Ryan Giunta met Dingman in New York City in or around 2006 through a mutual friend.  Giunta and Dingman became friends and explored various business opportunities together.  Giunta spent time with Dingman's family and regularly visited their homes in New York City, New Hampshire, and Nassau.  Over the years, Giunta came to trust Dingman as both a friend and business partner.

39.     Giunta has over 14 years of experience in brand development, marketing, and advertising.

40.     In October 2012, Giunta was working as a full time consultant for a start-up beverage company in New York.

41.     Dingman encouraged Giunta to leave his job in New York and relocate to the Bahamas in order to help Dingman build his hospitality business.  During a conversation at Dingman's family's home on the Upper East Side of New York City, Dingman promised to personally guarantee Giunta, through M101 Group II LLC, an annual salary of $150,000 (or $12,500 a month) if Giunta agreed to serve as business manager for Dingman's companies.

42.     In reliance on Dingman's representations and promises, in November 2012, Giunta ended his employment in New York.

43.     By oral agreement that is reflected in written documents and communications, Dingman again promised Giunta, through M101 Group II LLC, an annual salary of $150,000, to be reduced by fees Giunta and/or M101 Group II LLC received in connection with certain consulting work performed during this period (which ultimately turned out to be $5,000 a month, bringing Dingman's share down to $7,500 a month).  In addition, Dingman promised Giunta 10 percent equity ownership in Out West Hospitality.

44.     Dingman further assured Giunta that he had secured all the necessary work permits for Giunta to work in the Bahamas.  However, no such permits were obtained.

45.     In or around January 2013, in reliance on Dingman's promises, Giunta packed up his New York City apartment, put most of his belongings into storage, and, on February 2, 2013, relocated to the Bahamas to work for Dingman, incurring approximately $4,000 in moving fees that Defendants never reimbursed.

46.     When he arrived, Giunta joined a small team of Dingman's associates who had already begun the process of establishing Out West Hospitality.

47.     Plaintiff Kirk Bouffard, a hospitality general manager with extensive experience managing bars and nightclubs, had been exploring the prospect of partnering with Dingman on a bar or restaurant since in or before July 2012.  In or about October 2012, Bouffard joined Dingman's team as Dingman started to build his hospitality empire.  Bouffard was particularly interested in developing the BahaMex restaurant concept and, in or around October 2012, Bouffard agreed to convert a $10,000 loan Bouffard had previously given Dingman into an investment in BahaMex.

48.     Upon information and belief, no shares of BahaMex were ever issued or registered to Bouffard.

49.     Bouffard became more involved with Dingman's projects in or around January 2013, at which time he agreed to serve as a managing partner of Out West Hospitality, investing his time, money, and expertise to build the business.

50.     Non-party Frank Valdez ("Valdez"), whose family had known the Dingmans for over a decade and who had experience in the food and beverage business, joined forces with Dingman in or around January 2013, investing $695,000 of his own personal funds as well as his time in consideration for what was originally agreed upon as a one-third ownership stake in Out West Hospitality.

51.     Dingman represented to Bouffard and Valdez that the three of them would be equal partners in Out West Hospitality, each owning approximately one third of the Company's stock.

52.     Throughout 2013, Giunta, Bouffard, and Valdez worked with Dingman to commence the business operations of Out West Hospitality.  They negotiated leases, developed

restaurant concepts, planned renovations, managed staffing, oversaw operations, and consulted with lawyers to obtain licenses.

***Launch of the Out West Hospitality Properties***

53.    Though Dingman signed leases for BahaMex and 25 North in February 2013, his primary focus in launching his hospitality brand was the opening of the Traveller's, a restaurant that reclaimed the name and location of an iconic Bahamian establishment that had been closed since 2012.

54.    In or about March 2013, Dingman hired native Bahamian, Plaintiff Jason Rolle to serve as the general manager of the Traveller's.  Although renovations were incomplete, Traveller's opened for business in April 2013.

55.    With expenses mounting, Dingman turned to his business partners for additional funding.  From in or about January 2013 through in or about August 2013, at Dingman's urging, Bouffard made additional cash investments into the project to help cover a range of operational expenses, including payroll, rent, construction supplies, and corporate formation fees.

56.    Dingman told Bouffard that he needed the funds to cover these costs because Dingman was having trouble securing the necessary approvals for a corporate bank account through which Dingman could wire his own seed money.  Dingman promised Bouffard that, in return for his additional investments, Bouffard would receive a proportionate equity share in Out West Hospitality.

57.    Relying on Dingman's representations that Bouffard would receive a proportionate equity share in Out West Hospitality (which Bouffard understood would be no less than 33 percent in the absence of an event of dilution), Bouffard transferred to Defendants his life savings of $130,000.

58.     Despite all the work Giunta had performed in connection with the Traveller's, Out West Hospitality, and its other purported subsidiaries, Giunta did not receive a single paycheck from Dingman months into his employment.  When Giunta inquired about his salary, which he did frequently, Dingman always had an excuse and assured him the money was coming soon.

59.     Having worked on start-up businesses before, Giunta understood that cash flow might be low in the first few months of a company's life.  Nonetheless, Dingman promised Giunta he would be the first to get paid following a second round of capital raising.

60.     For many months, Giunta continued to believe Dingman and continued to manage the business and invest his time and energy coordinating with vendors, marketing the restaurants, interfacing with staff and consultants, and building the brand name.

### *Defendants Fail to Pay Their Consultants*

61.     In June 2013, Dingman and Out West Hospitality engaged Plaintiff Preston Rideout, a Nevada-based hospitality specialist, as an operations consultant for Out West Hospitality.  Pursuant to their consulting agreement, Out West Hospitality agreed to pay Rideout $5,000 per month for his services.

62.     As he did with Giunta, Dingman assured Rideout that he had secured all the necessary permissions and documentation for him to work legally in the Bahamas during the full term of his employment.  However, other than an initial temporary permit for Rideout, which was obtained by Bouffard, Dingman failed to obtain the necessary permissions and documentation.

63.     Rideout worked for Out West Hospitality for a period of three months and never received the $15,000 he earned for his services.

64.     Several months after its opening, the Traveller's and Out West Hospitality's other locations continued to undergo significant renovations, including approximately $2,251.94 worth of tile and other building supplies from Plaintiff Tile King.  Plaintiff Tile King never received payment for those building supplies.

65.     Similarly, between August 2013 and February 2014, the Traveller's accepted and benefitted from $5,856.88 worth of building supplies provided by Plaintiff FYP for which the Traveller's did not pay.

### *Dingman Causes Defendants' Expenses to Increase*

66.     Though the Traveller's was still struggling to get off the ground, Dingman opened another restaurant, the Island Smoke House, in or around August 2013, just a few months after launching the Traveller's.  Dingman hired Chaz Brown, a former contestant on Bravo's Top Chef as the Island Smoke House's head chef.  Dingman promised Brown a salary of approximately $2,200 a week.

67.     Though Brown worked diligently at the Island Smoke House and garnered publicity for the restaurant for approximately 10 weeks, Dingman failed to pay him fully and completely for his services and failed to reimburse him as promised for business expenses such as cell phone usage and transportation.  The partial payments Brown received for his work at the Island Smoke House were drawn from the bank account of the Traveller's.

68.     As of the date of this Complaint, Dingman owes Plaintiff Brown at least $5,200 in unpaid salary and unreimbursed expenses.

69.     Plaintiff Rolle, who had started out as general manager of the Traveller's, was asked to take on more and more responsibilities.  Eventually, Dingman asked Rolle to be the general manager of Out West Hospitality and at least three of the restaurants purportedly under

its umbrella.  For his services, Dingman promised him a salary of at least $80,000 a year.  In addition, Rolle was to receive a phone allowance of $100 a month as well as reimbursement of business-related travel expenses.

70.     Dingman failed to pay Rolle roughly $46,113 in salary, allowances, severance, and reimbursements for the period of his employment.

71.     In or about August 2013, Bouffard expressed concern to Dingman about Dingman's decision to proceed with the opening of the Island Smoke House before addressing the substantial financial difficulties he was having launching the Traveller's.  Bouffard reminded Dingman that he had invested his life savings in the Traveller's.

72.     In response to Bouffard's concerns, Dingman promised Bouffard that Dingman would return 100 percent of Bouffard's investment.

73.     In September 2013, Bouffard sought to exit the unprofitable partnership and emailed Dingman requesting a call to discuss the terms of his exit.  Dingman never responded.

74.     In October 2013, Dingman retained Plaintiff People First to recruit, manage and handle payroll for the personnel working at the Traveller's restaurant.  In or around November 2013, Dingman, Out West Hospitality, and the Company's purported subsidiaries were already falling behind on payments and the Traveller's staff was threatening to walk out.

75.     By this time, Dingman had already fallen well behind on rental payments for two other restaurants he had tried to get off the ground, 25 North and Baha Mex, properties whose leases he had signed in February 2013.  Though 25 North had briefly opened for business, BahaMex was never operational.  The landlord of these properties made numerous, failed attempts to collect the outstanding amounts and ultimately evicted both businesses, changed the locks, and rented the spaces out to new tenants.

12

76. The evictions caused additional liabilities for Out West Hospitality because various vendors were unable to recover equipment they had delivered to those businesses.

77. Notwithstanding these financial difficulties, in December 2013, Dingman entered a long term lease for an additional hospitality business, the Beach Club Café, a sea-side restaurant and lounge that Dingman envisioned as the signature Out West Hospitality property. In an effort to prepare the property to open, Out West Hospitality hired Plaintiff Adderley, a local Bahamian contractor, to paint the premises. Nevertheless, the venue never opened to the public, and Defendants continue to owe Adderley at least $2,170.00.

78. In addition, Dingman entered into a second contract with People First in or around January 2014, to recruit, manage and handle payroll for the staff of Island Smoke House's staff.

79. In consideration for People First's services, the Traveller's and Island Smoke House agreed to pay People First all costs and expenses associated with the staff, a weekly service charge of $750 and late payment fees. Dingman and Out West Hospitality failed to make payments on numerous occasions. As of the date of this Complaint, Defendants owe People First no less than $160,000.

### *Seeking and Defrauding Investors*

80. On or about September 12, 2013, non-party Edward Fields ("Fields"), a prominent Bahamian businessman and close friend of the Dingman family, invested $25,000 in the Traveller's. Upon information and belief, in exchange for his investment, Fields was promised a proportionate share of equity in Out West Hospitality.

81. At or around that same time, Dingman procured an investment of $50,000 from Lenjohn van der Wal ("van der Wal"), another Bahamian resident with close ties to the Dingman

family.  Upon information and belief, in exchange for his investment, van der Wal was also promised a proportionate share of equity in Out West Hospitality.

82.     Plaintiff Erik H. Gordon met Jamie Dingman through their mutual friend, Plaintiff Ryan Giunta, in or around late 2011.  Gordon and Dingman became friends.  Throughout 2013, Gordon and Dingman spent time together during Dingman's many trips to his family's residence in New York City.

83.     In April 2013, Dingman invited Gordon to visit him in the Bahamas and showed Gordon his fledgling restaurant, the Traveller's.  Dingman also began to describe to Gordon his plans for Out West Hospitality.

84.     In or around November 2013, Dingman first approached Gordon about investing in Out West Hospitality.  Over meetings in New York as well as over phone calls Gordon took from New York, Dingman represented to Gordon that Out West Hospitality was the parent company of Dingman's other Bahamian businesses, owning 100 percent of the shares of his other companies, including the Traveller's and the Island Smoke House.  Any investment in Out West Hospitality or any of its purported subsidiaries, Dingman told Gordon, would be in consideration for a proportionate equity/partnership stake in Out West Hospitality.

85.     During these meetings and phone calls, Dingman also misrepresented to Gordon that Dingman himself had invested significant sums – between $600,000 and $900,000 – into Out West Hospitality, giving Gordon the false impression that the Company was already well-capitalized.

86.     At the time Dingman made these representations to Gordon, however, Out West Hospitality did not own any of Dingman's other hospitality businesses.   In fact, upon information and belief, Out West Hospitality had no assets at all.

14

87.     The first investment opportunity Dingman presented to Gordon related to Traveller's Restaurant.  On November 5, 2013, Dingman sent Gordon an email attaching an investment presentation for the Traveller's Restaurant.  The presentation purported to be prepared by the Shipston Group and listed Jamie Dingman, JTD@shipstongroup.com as the contact.

88.     Upon information and belief, at all relevant times, Dingman owned 4,999 of the Traveller's 5,000 shares, with the remaining share owned by Chris Wells, an attorney at Graham Thompson, who holds the share in trust for Dingman.

89.     On November 6, 2013, Dingman told Gordon that he viewed the Traveller's "as a stepping stone for more exciting things that lie ahead," noting: "we are up to eight restaurants and bars, with the super majority having all the proper documentation and permitting locked up and most being open by the end of this month."

90.     In addition to telling Gordon that his investments in the Traveller's would earn him equity shares in Out West Hospitality, Dingman also represented that, upon completion of his planned investment schedule, Gordon and Dingman would each be 50% equity owners in Out West Hospitality.  This representation was false because Dingman had already promised equity stakes to others, including Valdez, Bouffard, Giunta, Fields, and van der Wal.

91.     Dingman further assured Gordon that Gordon's shares would be properly registered with the appropriate Bahamian authorities by the beginning of 2014.  This was material to Gordon's investment decision because he was interested in building investments in Bahamian enterprises sufficient to meet the minimum threshold for obtaining permanent residency in the Bahamas.

92.     Dingman was well aware that Gordon's decision to invest with him was motivated in part by a desire to obtain permanent residency in the Bahamas.

93.     In addition to the aforementioned misrepresentations, Dingman told Gordon that should Gordon be dissatisfied in any way with the direction or performance of the Company, Dingman would fully refund Gordon's investment and that Dingman could easily keep his various projects funded through his own capital.

94.     Relying on Dingman's promises, on or about November 22, 2013, Gordon wired $100,000 from his personal bank account in New York to Traveller's in the Bahamas.

95.     In an acknowledgment letter that was transmitted approximately three days prior to Gordon's wire transfer (presumably in anticipation of receiving the investment), Dingman made the following representation: "This letter is to acknowledge the receipt of 3 wires in the total amount $100,000.00 USD made out to Traveller's Restaurant. Out West Hospitality, Ltd intends to use the funds to purchase material and general operations.  The investment will represent a 10 percent stake in the holding company of Out west Hospitallity [sic]." He concluded the letter: "We appreciate your support and investment in the holding company."

96.     These representations were false because, upon information and belief, Out West Hospitality did not own the Traveller's and had not issued or registered shares to anyone other than Dingman and his agent.  In addition, upon information and belief, Gordon's funds were not used exclusively to purchase material and fund general operations of the Company, but rather, were used towards Dingman's other business and leisure endeavors.

97.     For example, Dingman withdrew cash from a safe at the Traveller's to make cash purchases of marijuana for his personal use.  He also paid his personal housekeeper with cash he

withdrew from the Out West Hospitality safe before eventually putting the housekeeper on payroll with People First.

98.     On or about December 17, 2013, Gordon wired another $150,000 from his personal bank account in New York to Traveller's in the Bahamas.  In an acknowledgment letter that was again transmitted approximately three days prior to Gordon's wire transfer, Dingman made the following representation: "This letter is to acknowledge the receipt of 2 wires in the total amount $150,000.00 USD made out to Traveller's Restaurant. Out West Hospitality, Ltd intends to use the funds to purchase of The Beach House and general operations.  The investment will represent a[nother] 10 percent stake in the holding company of Out west Hospitallity [sic]. January 15th the company will issue shares that will represent a total investment of 250,000 USD."  He concluded the letter: "We appreciate your support and investment in the holding company."

99.     As with Dingman's first acknowledgment letter, his representations were false. Out West Hospitality did not own the Traveller's, did not issue or register shares to Gordon, and Dingman used Gordon's funds for purposes other than those he described.

100.     To help Out West Hospitality, Gordon suggested that Plaintiff Ben DeForest, an experienced restaurateur, travel to the Bahamas and assist in developing the menu and operations at the Traveller's.  Dingman agreed to engage DeForest's services and he offered to reimburse DeForest for his travel and lodging as well as to arrange for the necessary work permissions.  As with Giunta, Bouffard, and Rideout, no such permissions were obtained.

101.     Relying on Dingman's promises, in or around November of 2013, DeForest traveled to the Bahamas.  DeForest worked on site at the Traveller's and the Island Smoke House for approximately four weeks, developing menu ideas, managing and training staff, cleaning and

organizing the kitchen, and providing recommendations concerning how to hire, retain, and terminate employees for Out West Hospitality, and the Company's purported subsidiaries.

102.     As agreed, DeForest paid for his travel and lodging out of his own pocket, incurring roughly $1,030 in expenses before submitting them to Dingman for reimbursement. Contrary to his express promises, Dingman never reimbursed DeForest for those expenses.

103.     Though Dingman had assured all of his non-Bahamian employees, including Giunta, DeForest, and Rideout that he had procured the necessary work permits for them, he never did so, making it particularly difficult for these employees to recover their unpaid wages in the Bahamas.

104.     During the period from January through April 2014, Dingman continued to represent to Gordon that Gordon was the only Out West Hospitality investor other than Dingman himself and that, following Gordon's multiple investments, they each owned 50% of the Company.

105.     Dingman continued to tell Gordon that Dingman himself had invested significant sums into Out West Hospitality, for example representing in two March 27, 2014 emails, that he had invested as much as $1.3 million into the Company.  Upon information and belief, Dingman invested little (if any) of his own capital into the Company and certainly nowhere near the $600,000 to $1.3 million he reported to Gordon on multiple occasions.

106.     After Dingman's failure to disclose to Gordon any of the Company's financial records despite Gordon's repeated requests, Gordon eventually turned to Out West Hospitality's attorney, Chris Wells of Graham Thompson, seeking capital tables, profit and loss records, and cash flow statements.  Gordon's requests went unanswered notwithstanding the fact that he was purportedly a 50% partner in the Company whose financials he sought to review.

107.     Upon information and belief, Defendants failed to maintain any such financial books and records.

108.     Dingman repeatedly misrepresented the Company's financial condition to Gordon. For example, on or about April 22, 2014, Dingman told Gordon there was $140,000 in the Out West Hospitality bank account in order to induce him to invest additional funds.  In fact, Out West Hospitality did not have its own bank account and the then-existing balance in the Traveller's account to which Dingman was presumably referring was roughly $2,000.

109.     On or about April 22, 2014, Dingman also falsely assured Gordon that neither Out West Hospitality nor any of its purported subsidiaries had any debt and that both the Traveller's and the Island Smoke House were profitable.

110.     Dingman never registered Gordon's Out West Hospitality investment with the Bahamian authorities as promised, thwarting Gordon's efforts to build Bahamian investments sufficient to put him on a path towards permanent residency.

### *The Scheme is Uncovered*

111.     On March 7, 2014, Dingman asked Gordon to wire $18,000 immediately to People First to cover Out West Hospitality's payroll.  According to Dingman, he had tried to make the payment himself but the wire was "flagged" because it came from Dingman's personal checking account and Dingman's busy travel schedule prevented him from making the payment. Dingman's assistant, writing on Dingman's behalf, told Gordon: "funds can be sent back this coming Tuesday or it can go toward your overall investment."

112.     To prevent the staff from going unpaid, Gordon made the wire transfer of $18,000 from his personal bank account in New York City to People First in the Bahamas on or about March 12, 2014.

113.   On or about that same date, Gordon made an additional $75,000 investment in Out West Hospitality, wiring that amount from his personal bank account in New York City to Traveller's in the Bahamas.

114.   A few weeks later – on March 27, 2014 – Dingman again asked Gordon for an additional investment.  Conceding that he had failed to pay Giunta for his services to Out West Hospitality, Dingman asked Gordon to cover a portion of the past due payment, requesting that Gordon wire $32,000 directly to Giunta.

115.   Though Gordon was prepared to expend funds to cover Giunta's salary, Giunta declined the offer, explaining that he did not want Gordon to be personally responsible for Out West Hospitality's debts.  Nor did Giunta understand why Dingman was suggesting an arbitrary figure of $32,000 when, by that time, Giunta was owed well over $100,000 for past services and unreimbursed business expenses.

116.   With no funds from Dingman or Out West Hospitality, Giunta was forced to withdraw substantial sums from his 401K at steep penalties in order to pay his living expenses.  Notwithstanding Dingman's personal guarantee of $7,500 a month, during the 15 months that Giunta worked for Dingman, Giunta was paid a total of $3,000.  During those 15 months Giunta also incurred approximately $37,000 in out-of-pocket expenses on behalf of Defendants' operations, as well as approximately $6,500 to store his personal property in New York – expenses for which he was never reimbursed.

117.   With respect to the finances of his operations, Dingman explained to Gordon in an April 22, 2014 email that profits from the Traveller's Restaurant were being used for "domestic salaried people[,] food and booze[,] and that what is left over we pay for renovation.  He further

explained that the Island Smoke House "pays for the other places, including Harbour terrace [sic]."

118.    Dingman explained, "you just have a peter paying paul [sic] situation."

119.    Despite Dingman's assurances that Out West Hospitality and the Company's purported subsidiaries were operating profitably on a combined basis, by August of 2014, all of the businesses had closed their doors with no indication of when they might reopen.

120.    On September 9, 2014, Dingman wrote a joint letter to all Out West Hospitality investors finally acknowledging that all of the businesses had been closed.  Dingman continued, however, to misrepresent the financial condition of Out West Hospitality.  "Dear Investors," he wrote, "In August we decided to shut down due to reorganization, bad weather, the 'off' season and to give time for the new team to reboot.  I am proud and pleased to announce that we have closed a partnership with a third-party managing partner, who has immense experience in the restaurant, hotel and leisure business."

121.     In his September 2014 letter, Dingman further announced that he was doing a "capital call," seeking to raise additional funds for Out West Hospitality and that if current investors failed to participate – that is, if they failed to give Dingman and Out West Hospitality more money – their shares would be diluted.

122.    The existence of other equity holders was a surprise to Gordon due to Dingman's prior representations that only Gordon and Dingman held equity interests in these businesses.

123.    During the time that Dingman was purportedly developing his hospitality brand in the Bahamas, he was simultaneously serving as an officer of an unrelated public company called Gameplan Holdings, Inc. ("Gameplan").  As Out West Hospitality's troubled financial situation began to come to light, Plaintiffs Giunta and Gordon made further inquiries into Dingman's

endeavors, and they became concerned that Dingman had diverted or attempted to divert funds from Gameplan to Out West Hospitality and/or its affiliates.

124.    During a telephone call on September 23, 2014, an officer of Gameplan told Gordon and Giunta that, on or about September 30, 2013, two or three wire transfers – ranging between roughly $10,000 and $20,000 – had been made from Gameplan at Dingman's direction to cover payroll and operational expenses incurred by Out West Hospitality.

125.    Over the next few weeks, in response to Gordon's efforts to obtain explanations about Out West Hospitality's financials, Dingman evaded Gordon's emails and phone calls and refused to provide any information about Out West Hospitality's solvency or management or whether any of Out West Hospitality's venues would reopen.  He likewise declined to refund Gordon's investment.

126.    Although all of the Out West Hospitality properties had been closed in August, Dingman withheld this information from Plaintiff YNG Group, a small local business that had contracted with Dingman in or about July 2014 to host a promotional event on October 31, 2014 at the Harbour Terrace, a private event space Dingman planned to operate on the second floor of the Island Smoke House.

127.    YNG Group is operated by a group of young men from underprivileged and mostly single-parent households in the Bahamas.  Having little in the way of personal funds to support their small business, the members of YNG Group have sought to raise capital and build their business by expanding their network in the Bahamas.  The promotional event YNG Group planned to host at the Harbour Terrace was intended to support these entrepreneurial efforts.

128.    Under the contract between YNG and Dingman, Out West Hospitality and the Traveller's had agreed to make the Harbour Terrace facilities available for YNG Group's event

for a total cost of $1,500.  In reliance on this contract, YNG Group paid a $500 deposit on or about July 31st and advertised their event widely.

129.    Just days before the event was to be held, the space remained uninhabitable: the power and water had been shut down for lack of payment and, without access to power and water, the venue was filthy and in need of a deep cleaning to prepare the space for the crowds that were expected for YNG Group's event.

130.    Two days before the scheduled fundraiser event, a representative of YNG Group emailed Dingman pleading for him to restore the power and water and have the space opened the following morning so that YNG could set up and prepare for the event.  Dingman replied simply: "bill was paid today, thanks for email[.]"  But the following day, October 30, 2014 – just one day before YNG Group was to hold their promotion – neither the water nor the power had been restored.  Dingman then evaded YNG Group's phone calls and failed to respond to their pleas.

131.    Unable to obtain the necessary services from Dingman or to find another location on such short notice, YNG Group was forced to work directly with the property owner and to procure its own vendors and supplies in order to make the space usable for its long scheduled event.

132.    YNG Group rebooked the space directly with the landlord, paying an additional $600 deposit and $400 upon completion of the event.

133.    In addition, YNG Group incurred roughly $2,000 in expenses to supply the space with proper power, lighting, water, and refrigeration.

134.    Despite incurring these additional expenses, YNG Group was not able to make the event successful.  Because Dingman left the property in such an uninhabitable state, YNG Group lost not only its deposit with Dingman, the additional amounts it had to spend to rebook

23

the space directly with the landlord, and the out-of-pocket costs that it incurred to make the space useable, but also its credibility and the expected promotional benefits that would have come to the company from the execution of a successful event.

135.    When YNG Group confronted Dingman about the situation, he dismissed their concerns, asking: "What are you gonna do, sue me?"

### *Dingman's Abuse of the Corporate Form Requires Piercing of the Corporate Veil*

136.    Upon information and belief, throughout the course of his business dealings with Plaintiffs, Defendant Dingman abused the privilege of doing business in the corporate form by exercising complete domination and control over Out West Hospitality, BahaMex, the Traveller's, and the Island Smoke House, treating these companies as his alter egos, and using the corporate form to evade and conceal personal liabilities as detailed in the foregoing paragraphs.

137.    Upon information and belief, all shares of Out West Hospitality, BahaMex, the Traveller's, and the Island Smoke House are owned and controlled either by Dingman directly or by Dingman's agents holding the shares for Dingman's sole benefit.

138.    Upon information and belief, Dingman directs all operations and controls all the finances of Out West Hospitality, BahaMex, the Traveller's, and the Island Smoke House.

139.    Upon information and belief, Dingman never opened separate bank accounts for Out West Hospitality, BahaMex, or the Island Smoke House, but instead, used the bank account of the Traveller's to hold assets and pay expenses associated with all his other hospitality businesses as well as his own personal expenses, including expenses for leisure travel, personal housekeeping, and recreational drugs.

140.    Upon information and belief, Dingman disregarded the corporate form by transferring assets and liabilities between and among himself, Out West Hospitality, BahaMex, the Traveller's, the Island Smoke House, and other hospitality businesses he created in the Bahamas without consideration in order to evade creditors and enrich himself.

141.    Upon information and belief, Dingman also disregarded the corporate form by utilizing employees of one company in service of his other companies, failing to engage in corporate formalities such as election of directors and maintenance of corporate records, inadequately capitalizing his companies, and failing to ensure that his companies had sufficient income and/or assets to meet their liabilities.

142.    Upon information and belief, Dingman incorporated Out West Hospitality, BahaMex, the Traveller's, the Island Smoke House, and his other hospitality businesses in the Bahamas, exercised complete domination and control over these companies, and abused their corporate forms in order to perpetuate a fraud against Plaintiffs and evade liabilities he incurred to Plaintiffs through his solicitation and acceptance of their investments and services based on his material misstatements.

143.    Piercing the corporate veil is necessary to prevent Dingman from avoiding liability and evading creditors through his abuse of the corporate forms of Out West Hospitality, the Traveller's, and the Island Smoke House.

**FIRST CLAIM FOR RELIEF:**
**VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT,**
**15 U.S.C. § 78j(b) and EXCHANGE ACT RULE 10b-5, 17 C.F.R. § 240.10b-5**
**(Against Dingman, BahaMex, Out West Hospitality, and the Traveller's)**

144.     Plaintiffs repeat and reallege each of the foregoing paragraphs as if fully set forth herein.

145.     Between January 2013 and September 2014, Defendant Dingman on behalf of himself, BahaMex, Out West Hospitality and the Traveller's, with scienter, by use of the means or instrumentalities of interstate commerce or of the mails, in connection with the sale of securities in Out West Hospitality: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and; (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit up on any person.

146.     Defendants Dingman, BahaMex, Out West Hospitality, and the Traveller's engaged in the aforementioned conduct by, among other things, falsely representing that Out West Hospitality was the holding company and 100% owner of the Traveller's and BahaMex, falsely representing they were issuing shares of Out West Hospitality to Bouffard, Giunta, and Gordon in proportion to their respective investments, falsely representing that Dingman himself had invested between $600,000 and $1.3 million in Out West Hospitality, failing to prepare or maintain adequate financial records (including any capital tables, profits and loss records, or cash flow statements), knowingly concealing adverse material information about the business and operations of Out West Hospitality, and using the investments for purposes unrelated to Out West Hospitality.

147.     Further, Defendant Dingman falsely represented to Gordon that he and Dingman were the only equity stakeholders in Out West Hospitality and that Gordon's shares would be properly registered with the appropriate Bahamian authorities.

148.     These material misrepresentations and/or omissions were made knowingly or recklessly and for the purpose of inducing Plaintiffs to invest money or services to purchase and hold securities in Out West Hospitality.

149.     Relying on these misrepresentations and/or omissions, and as a result thereof, Plaintiffs Bouffard, Giunta, and Gordon invested money or services for the purpose of purchasing and holding securities in Out West Hospitality.

150.     By reason of the activities described above, Defendants Dingman, Out West Hospitality, BahaMex, and the Traveller's, violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and the Exchange Act Rule 10b-5, 17 C.F.R. § 240.10b-5.

151.     By reason of the activities described above, Plaintiff Bouffard was damaged in an amount to be determined at trial but not less than $280,000.

152.     By reason of the activities described above, Plaintiff Giunta was damaged in an amount to be determined at trial but not less than $100,000.

153.      By reason of the activities described above, Plaintiff Gordon was damaged in an amount to be determined at trial but not less than $343,000.

**SECOND CLAIM FOR RELIEF:**
**BREACH OF CONTRACTS**
**(Against all Defendants)**

154.     Plaintiffs repeat and reallege each of the foregoing paragraphs as if fully set forth herein.

155.     Defendants Dingman, Out West Hospitality, the Traveller's, and the Island Smoke House breached a variety of service, investment, and employment contracts with Plaintiffs as set forth in the following paragraphs:

156.     Plaintiff Adderley had express oral and written contracts with Defendant Out West Hospitality pursuant to which Plaintiff Adderley agreed to provide painting services to Defendant Out West Hospitality and Defendant Out West Hospitality agreed to pay for those services according to prices set forth in Plaintiff Adderley's invoices.

157.     Plaintiff Adderley performed under its contract with Defendant Out West Hospitality by providing the requested painting services.

158.     Defendant Out West Hospitality breached its contract with Plaintiff Adderley by failing to pay for the painting services.

159.     By reason of Defendant Out West Hospitality's contractual breach, Plaintiff Adderley has been damaged in an amount to be determined at trial, but no less than $2,170.00.

160.     Plaintiff Bouffard had an express oral contract with Defendants Dingman, BahaMex, Out West Hospitality, and the Traveller's, pursuant to which Bouffard agreed to invest approximately $130,000 and nine months of management services in consideration for a 33 percent equity stake in Out West Hospitality, a return on his investment, and/or compensation for services rendered.

28

161.    Plaintiff Bouffard performed under his contract with Defendants Dingman, BahaMex, Out West Hospitality, and Traveller's, by investing approximately $130,000 and nine months of management services.

162.    Defendants Dingman, BahaMex, Out West Hospitality, and Traveller's breached their contract with Plaintiff Bouffard by failing to issue or register Bouffard's shares in Out West Hospitality and failing to compensate him for services rendered.

163.    By reason of Defendants Dingman, BahaMex, Out West Hospitality, and Traveller's contractual breach, Plaintiff Bouffard has been damaged in an amount to be determined at trial, but no less than $280,000.

164.    Plaintiff Brown had an express oral contract with Defendants Dingman, Out West Hospitality, and the Island Smoke House pursuant to which Plaintiff Brown agreed to create a menu for the Island Smoke House and manage its staff and Defendants Dingman, Out West Hospitality, and the Island Smoke House agreed to compensate Plaintiff Brown with a salary of approximately $2,200 a week and to reimburse Brown for business expenses incurred by Brown in the course of his work.

165.    Plaintiff Brown performed under his contract with Defendants Dingman, Out West Hospitality, and the Island Smoke House by creating a menu for the Island Smoke House and managing its staff.

166.    Defendants Dingman, Out West Hospitality, and the Island Smoke House breached their contract with Brown by failing to compensate him fully for his services and failing to reimburse him for business expenses incurred in the course of his work.

167.    By reason of Defendants Dingman, Out West Hospitality, and the Island Smoke House's contractual breach, Brown has been damaged in an amount to be determined at trial, but not less than $5,200.

168.    Plaintiff DeForest had an express oral contract with Defendants Dingman, Out West Hospitality, the Traveller's, and the Island Smoke House pursuant to which Defendants agreed to reimburse DeForest for out-of-pocket expenses incurred in connection with DeForest's travel to the Bahamas to provide culinary consulting services to Defendants.

169.    Plaintiff DeForest performed under his contract with Defendants by travelling to the Bahamas and working on site at the Traveller's and the Island Smoke House to provide culinary consulting services to Defendants.

170.    Defendants breached their contract with Plaintiff DeForest by failing to compensate him for his out-of-pocket expenses.

171.    By reason of Defendants' contractual breach, Plaintiff DeForest has been damaged in an amount to be determined at trial, but no less than $1,030.

172.    Plaintiffs Giunta and M101 Group II LLC had an express oral contract with Defendants pursuant to which Plaintiff Giunta and M101 Group II LLC agreed to manage and preside over Out West Hospitality and Defendants agreed to compensate Giunta, through M101 Group II LLC, with an annual salary of $150,000 (less certain consulting fees received by Giunta) and with 10 percent equity in Out West Hospitality.

173.    Plaintiffs Giunta and M101 Group II LLC performed under their contract with Defendants by managing and presiding over Out West Hospitality from in or around February 2013 through in or around May 2014.

174.    Defendants breached their contract with Plaintiffs Giunta and M101 Group II LLC by failing to compensate them.

175.    By reason of Defendants' contractual breach, Plaintiffs Giunta and M101 Group II LLC have been damaged in amount to be determined at trial, but no less than $250,000.

176.    Plaintiff Gordon had express oral and written contracts with Defendants pursuant to which Plaintiff Gordon agreed to invest money in Out West Hospitality and Defendants agreed to convey to Gordon equity shares in Out West Hospitality, ultimately up to 50% of the Company.

177.    Plaintiff Gordon performed under his contract with Defendants by investing $343,000 in Out West Hospitality.

178.    Defendants breached their contract with Plaintiff Gordon by failing to issue or register to Gordon shares in Out West Hospitality.

179.    By reason of Defendants' contractual breach, Plaintiff Gordon has been damaged in an amount to be determined at trial, but no less than $343,000.

180.    Plaintiff People First had contracts with the Traveller's and Island Smoke House pursuant to which Plaintiff People First agreed to hire, manage and administer payroll for employees of the Traveller's and Island Smoke House.  Defendants agreed to pay People First all costs and expenses associated with the staff under People First's management two weeks in advance of the staff's designated pay day, subject to a late payment fee, as well as to pay a weekly service charge of $750.

181.    Plaintiff People First performed under its contracts with the Traveller's and Island Smoke House by hiring, managing and administering payroll for employees of the Traveller's and Island Smoke House .

31

182.     Defendants Traveller's and Island Smoke House breached their contracts with Plaintiff People First by failing to pay all costs and expenses associated with personnel at the Traveller's and the Island Smoke House.

183.     By reason of Traveller's and Island Smoke House's contractual breach, Plaintiff People First has been damaged in an amount to be determined at trial, but no less than $160,000.

184.     Plaintiff Rideout had an express oral contract with Defendants Out West Hospitality and Dingman pursuant to which Rideout agreed to serve as an operations consultant for Out West Hospitality and Defendants Out West Hospitality and Dingman agreed to compensate Rideout at a rate of $5,000 per month.

185.     Plaintiff Rideout performed under his contract with Defendants Out West Hospitality and Dingman by serving as an operations consultant for Out West Hospitality for three months.

186.     Defendants Out West Hospitality and Dingman breached their contract with Plaintiff Rideout by failing to compensate him.

187.     By reason of Out West Hospitality and Dingman's contractual breach, Plaintiff Rideout has been damaged in an amount to be determined at trial, but no less than $15,000.

188.     Plaintiff Rolle had an express oral and written contract with Defendants Out West Hospitality and Dingman pursuant to which Rolle agreed to serve as the general manager of Out West Hospitality and Defendants Out West Hospitality and Dingman agreed to pay him an annual salary of $80,000, a phone allowance of $100 a month, and reimbursement of business-related travel expenses.

189.     Plaintiff Rolle performed under his contract with Defendants by serving as the general manager of Out West Hospitality.

190.    Defendants Out West Hospitality and Dingman breached their contract with Plaintiff Rolle by failing to compensate him for his services and failing to pay him the allowances, severance, and reimbursements to which he was entitled.

191.    By reason of Out West Hospitality and Dingman's contractual breach, Plaintiff Rolle has been damaged in an amount to be determined at trial, but no less than $46,113.

192.    Plaintiff Tile King had express oral and written contracts with Defendants Out West Hospitality and Traveller's pursuant to which Plaintiff Tile King agreed to supply tile and other building supplies to Out West Hospitality and Traveller's.  In return, Defendants Out West Hospitality and Traveller's agreed to pay for those supplies according to prices set forth in Plaintiff Tile King's invoices.

193.    Plaintiff Tile King performed under its contract with Defendants Out West Hospitality and Traveller's by supplying the requested tiles and other supplies.

194.    Defendants Out West Hospitality and Traveller's breached their contract with Plaintiff Tile King by failing to pay for the tiles and other supplies.

195.    By reason of Out West Hospitality and Traveller's contractual breach, Plaintiff Tile King has been damaged in an amount to be determined at trial, but no less than $2,251.94.

196.    Plaintiff YNG Group had an express oral and written contract with Defendants Out West Hospitality, the Traveller's, and Dingman pursuant to which Defendants Out West Hospitality, the Traveller's, and Dingman agreed to make the Harbour Terrace available to and habitable for Plaintiff YNG Group for a promotional event on or about October 31, 2014. Plaintiff YNG Group agreed to pay $1500 for the space, including an initial deposit of $500.

197.    Plaintiff YNG Group performed under its contract with Defendants Out West Hospitality, the Traveller's, and Dingman by furnishing a $500 deposition in or about July 2014.

33

198.     Defendants Out West Hospitality, the Traveller's, and Dingman breached their contract with Plaintiff YNG Group by failing to make the space available and habitable and failing to return the deposit.

199.     When Defendants Out West Hospitality, the Traveller's, and Dingman failed to make the space available and habitable, YNG Group was forced to rebook the property directly with the landlord for $100 more than it had contracted to spend and to expend approximately $2,000 for power, water, and refrigeration to make the space useable for its intended purpose.

200.     By reason of Out West Hospitality, the Traveller's, and Dingman's contractual breach, Plaintiff YNG Group has suffered direct and foreseeable consequential damages, including damages to its reputation, in an amount to be determined at trial, but no less than $2,100.

### THIRD CLAIM FOR RELIEF:
### FRAUD AND FRAUDULENT MISREPRESENTATION
**(Against Defendants Dingman, BahaMex, Out West Hospitality, and the Traveller's)**

201.     Plaintiffs repeat and reallege each of the foregoing paragraphs as if fully set forth herein.

202.     From in or about January 2013 through in or about August 2013, Dingman, on behalf of himself, BahaMex, Out West Hospitality, and the Traveller's repeatedly represented to Plaintiff Bouffard that Out West Hospitality owned or would own 100 percent of BahaMex, the Traveller's, and the Island Smoke House, that an investment of either labor or money in BahaMex, the Traveller's, the Island Smoke House or Out West Hospitality would entitle Bouffard to a proportionate equity/partnership stake in Out West Hospitality, and that Out West Hospitality had sufficient capital to support the profitable operation of Dingman's other

Bahamian hospitality businesses, which were purportedly operating under Out West Hospitality's umbrella.

203.    These representations were made with knowledge that they were false or in reckless disregard of their falsity.

204.    By making these false representations, Dingman intended to induce reliance by Plaintiff Bouffard and to cause Bouffard to invest money and provide services to Dingman, BahaMex, Out West Hospitality, the Traveller's, and/or the Company's other purported subsidiaries.

205.    Plaintiff Bouffard reasonably relied on Dingman's false representations and invested $130,000 in the Traveller's in or around August 2013 and did provide hospitality management services to Dingman, Out West Hospitality, the Traveller's, and/or the Company's other purported subsidiaries from in or around January 2013 through in or around September 2013.

206.    As a result of Dingman's fraudulent representations, Plaintiff Bouffard was damaged in an amount to be determined at trial but not less than $280,000.

207.    From in or about February 2013 through in or about May 2014, Dingman, on behalf of himself, Out West Hospitality, and the Traveller's, repeatedly represented to Plaintiffs Giunta and M101 Group II LLC that payments towards Giunta's past-due guaranteed annual salary of $150,000 per year were forthcoming.  From in or around October 2012 through in or around September 2014, Dingman, on behalf of himself, Out West Hospitality, and the Traveller's further represented to Plaintiff Giunta that, in addition to his annual salary, Giunta would also be entitled to 10 percent equity in Out West Hospitality as additional compensation for his efforts to build the business.

208.    These representations were made with knowledge that they were false or in reckless disregard of their falsity.

209.    By making these false representations, Dingman intended to induce reliance by Plaintiffs Giunta and M101 Group II LLC and to cause Giunta to continue providing management services to Dingman, Out West Hospitality, the Traveller's, and/or the Company's other purported subsidiaries.

210.    Plaintiffs Giunta and M101 Group II LLC reasonably relied on Dingman's false representations and did continue providing management services to Dingman, Out West Hospitality, the Traveller's, and/or the Company's other purported subsidiaries from in or around February 2013 through in or around May 2014.

211.    As a result of Dingman's fraudulent representations, Plaintiffs Giunta and M101 Group II LLC were damaged in an amount to be determined at trial but not less than $250,000.

212.    From in or around November 2013 through in or around September 2014, Dingman, on behalf of himself, Out West Hospitality, and the Traveller's, repeatedly represented to Plaintiff Gordon – including on or about November 22, 2013 and December 17, 2013 – that Out West Hospitality owned or would own 100% of the Traveller's and the Company's other purported subsidiaries, that an investment of money in the Traveller's, the Island Smoke House, or in Out West Hospitality would entitle Gordon to a proportionate equity/partnership stake in Out West Hospitality, that Out West Hospitality had sufficient capital backing – including $600,000 to $1.3 million of Dingman's own capital – to support the profitable operation of Dingman's other Bahamian hospitality businesses under Out West Hospitality's umbrella, and that Dingman and Gordon were the only equity investors in Out West Hospitality.

213.    Further, Dingman falsely represented to Plaintiff Gordon that Gordon's shares would be properly registered with the appropriate Bahamian authorities.

214.    These representations were made with knowledge that they were false or in reckless disregard of their falsity.

215.    By making these false representations, Dingman intended to induce reliance by Plaintiff Gordon and to cause Gordon to invest money with Defendants.

216.    Plaintiff Gordon reasonably relied on Dingman's false representations and invested with Defendants: $100,000 on or around November 22, 2013; $150,000 on or around December 15, 2013; $18,000 on or around March 7, 2014; and $75,000 on or around March 12, 2014.

217.    As a result of Dingman's fraudulent representations, Plaintiff Gordon was damaged in an amount to be determined at trial but not less than $343,000.

**FOURTH CLAIM FOR RELIEF:**
**UNJUST ENRICHMENT**
**(Against all Defendants)**

218.    Plaintiffs repeat and reallege each of the foregoing paragraphs as if fully set forth herein.

219.    Plaintiffs Adderley, Bouffard, Brown, DeForest, FYP, Giunta, M101 Group II LLC, People First, Rideout, Rolle, and Tile King have provided Defendants building materials, consulting, branding, management, payroll and/or marketing services and/or have incurred certain out-pocket-expenses in connection with the provision of such services.

220.    Defendants have benefitted from these services and materials.

221.    Defendants have not fully compensated Plaintiffs Adderley, Bouffard, Brown, DeForest, FYP, Giunta, M101 Group II LLC, People First, Rideout, Rolle, and Tile King for these services and have not reimbursed Plaintiffs for these out-pocket-expenses.

222.    It is against equity and good conscience to permit Defendants to retain the benefits of these services and materials at the expense of Plaintiffs Adderley, Bouffard, Brown, DeForest, FYP, Giunta, M101 Group II LLC, People First, Rideout, Rolle, and Tile King.

223.    Plaintiff YNG Group paid Defendants a deposit toward renting a venue from Defendants.

224.    Defendants have benefitted from receipt of this deposit.

225.    Defendants did not make their venue available to or habitable for Plaintiff YNG Group's use.

226.    It is against equity and good conscience to permit Defendants to retain the benefits of YNG Group's deposit at the expense of YNG Group.

227.    Plaintiffs Gordon and Bouffard invested capital with Defendants for the purpose of obtaining equity stakes in Out West Hospitality and receiving profits therefrom.

228.    Defendants have benefitted from the receipt of these investments.

229.    Defendants did not issue Gordon or Bouffard any equity in Out West Hospitality.

230.    It is against equity and good conscience to permit Defendants to retain the benefits of Gordon's and Bouffard's investments without providing them the shares and/or profits to which they are entitled.

231.    Defendants have been unjustly enriched in an amount to be determined at trial but no less than $1,112,722.16.

### FIFTH CLAIM FOR RELIEF:
### <u>PROMISSORY ESTOPPEL</u>
### (Against All Defendants)

232.    Plaintiffs repeat and reallege each of the foregoing paragraphs as if fully set forth herein.

233.    From January 2013 through September 2014, Dingman on behalf of himself, BahaMex, Out West Hospitality, the Traveller's, and the Island Smoke House promised Plaintiffs that, if Plaintiffs provided certain services and products and/or invested capital in connection with the operation of Out West Hospitality and its affiliates, Defendants would compensate Plaintiffs for their services and products according to agreed-upon salaries and rates, reimburse Plaintiffs for their out-of-pocket expenses incurred in providing such services or products, and/or issue equity shares in Out West Hospitality in proportion to sums invested.

234.    Defendants further represented that BahaMex, the Traveller's, and the Island Smoke House were wholly owned subsidiaries of Out West Hospitality.

235.    Plaintiffs reasonably relied on Dingman's promises by continuing to provide services and products for Out West Hospitality and the Company's purported subsidiaries and by continuing to invest and/or retain investments in Out West Hospitality and/or BahaMex and the Traveller's.

236.    As a result of Dingman's false promises, Plaintiffs were damaged in an amount to be determined at trial but no less than $1,112,722.16.

### SIXTH CLAIM FOR RELIEF:
### <u>BREACH OF FIDUCIARY DUTY</u>
### (Against Defendant Dingman)

237.    Plaintiffs repeat and reallege each of the foregoing paragraphs as if fully set forth herein.

238.     As a partner of Plaintiffs Gordon, Giunta, and Bouffard and/or as a majority shareholder (and/or beneficiary of the majority shareholder) and president of a closely held corporation in which Plaintiffs Gordon, Giunta, and Bouffard purchased shares, Defendant Dingman owed Plaintiffs Gordon, Giunta, and Bouffard fiduciary duties, including the duties of loyalty and good faith.

239.     Defendant Dingman breached his duties loyalty and good faith by, among other things, failing to fully disclose to Plaintiffs Gordon, Giunta, and Bouffard all information related to Out West Hospitality and its purported subsidiaries and misappropriating assets belonging to Out West Hospitality, and diverting assets intended for Out West Hospitality for his own self-interest.

## **DEMAND FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

1.     An award of damages in an amount to be determined at trial, but not less than $1,112,722.16, plus interests and costs;

2.     An award of punitive damages in an amount to be determined at trial;

3.     Imposing a constructive trust against all Defendants for an amount no less than $1,112,722.16.

4.     The costs and disbursements of this action, including legal fees to the extent recoverable under Federal law or New York State law; and

5.      For such other and further relief as the Court may deem just and proper.

Dated:  New York, New York
        December 21, 2015

                                    SHER TREMONTE LLP

                                    By:    /s/ Justin M. Sher
                                           Justin M. Sher
                                           Robert Knuts
                                           Erica A. Wolff
                                    80 Broad Street, 13th Floor
                                    New York, New York 10004
                                    Tel: 212.202.2600
                                    Email: jsher@shertremonte.com

                                    *Attorneys for Plaintiffs*