UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ERIK H. GORDON, RYAN GIUNTA
and M101 GROUP LLC,

            15 Civ. 9935 (NRB) (NS)

       Plaintiffs,

            JURY TRIAL DEMANDED

   – against –

JAMES T. DINGMAN, OUT WEST
HOSPITALITY LTD. and THE TRAVELLER'S
BEACH RESTAURANT LTD.,

       Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## SECOND AMENDED COMPLAINT

Plaintiffs Erik H. Gordon ("Gordon"), Ryan Giunta ("Giunta") and M101 Group LLC ("M101"), by their undersigned attorneys, for their Second Amended Complaint against defendants James T. Dingman ("Dingman"), Out West Hospitality Ltd. ("OWH") and The Traveller's Beach Restaurant Ltd. ("Traveller's" and, collectively with Dingman and OWH referred to as "Dingman"), allege as follows:

## NATURE OF ACTION

1.  In or about late 2012, Dingman announced plans to establish a hospitality conglomerate that would own and operate a network of restaurants, bars, hotels and other venues in the Bahamas.

2.  This case arises out of Dingman's scheme to defraud investors -- including Gordon -- and steal money and services -- including from Giunta and M101 -- in connection with the development of that hospitality conglomerate. Defendants OWH and Traveller's are two entities through which Dingman perpetrated his scheme.

## JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, as the First Claim arises under the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b). Subject matter jurisdiction over the Second through Fifth Claims exists pursuant to 28 U.S.C. § 1367 because those claims for relief are so related to the First Claim as to form part of the same case or controversy.

4. This Court also has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(2), as there is complete diversity between the parties and the amount in controversy exceeds $75,000 per plaintiff, exclusive of costs and interest.

5. This Court has personal jurisdiction over defendants under C.P.L.R. § 302 and Rule 4 of the Federal Rules of Civil Procedure.

6. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in the Southern District of New York, or in the alternative, pursuant to 28 U.S.C. § 1391(b)(3).

## THE PARTIES

7. Gordon is an individual and citizen of Florida.

8. Giunta is an individual and citizen of New York.

9. M101 is a limited liability company formed under the laws of New York. M101 is a citizen of New York because its sole member, Giunta, is a citizen of New York.

10. Upon information and belief, Dingman is an American citizen who currently resides in and is a citizen of California or New Hampshire.

11. Upon information and belief, OWH is a corporation organized under the laws of the Bahamas with its principal place of business in Nassau, Bahamas. Upon information and belief, OWH has no assets and no longer conducts any business. It is joined as a nominal

defendant in this action because it was used by Dingman to commit the wrongful acts complained of herein.

12.     Upon information and belief, Traveller's is a corporation organized under the laws of the Bahamas with its principal place of business in Nassau, Bahamas.  Upon information and belief, Traveller's has no assets and no longer conducts any business.  It is joined as a nominal defendant in this action because it was used by Dingman to commit the wrongful acts complained of herein.

## FACTS COMMON TO ALL CLAIMS

13.     Giunta has over fifteen years of experience in brand development, marketing and advertising.

14.     In or about 2006, Giunta met Dingman in New York, New York through a mutual friend.

15.     On or about November 4, 2012, Dingman and Giunta had a conversation at Dingman's family home located at 133 East 64th Street in Manhattan (the "Dingman Home"). At that meeting, Dingman offered to retain Giunta, through M101 (Giunta and M101 hereinafter referred to collectively as "Giunta"), to provide consulting services at $150,000 per year in connection with Dingman's planned business venture.  As additional compensation, Dingman offered a ten percent equity interest to Giunta in the company that would eventually become OWH.

16.     Giunta accepted Dingman's offer.  In reliance on Dingman's representations and promises, on or about November 5, 2012, Giunta terminated his employment in New York.

17.     On or about February 2, 2013, Giunta moved to the Bahamas and began to provide consulting services and commence the business operations of Dingman's hospitality conglomerate.

18. Giunta fully performed under his agreement with Dingman.

19. Despite all the work that Giunta performed, Dingman paid only $3,000 in compensation to Giunta.

20. Upon information and belief, on September 6, 2013, Dingman incorporated OWH, purportedly to serve as a parent company for his hospitality businesses.

21. In or about November 2013, Dingman first approached Gordon about investing in OWH.

22. From on or about November 1, 2013 through on or about November 22, 2013, Dingman and Gordon met for lunch, at least two times per week, at Le Bilboquet and Minetta Tavern restaurants in Manhattan. During the same period, Dingman and Gordon met at least once at the Dingman Home. Dingman and Gordon also had several lengthy phone calls that Dingman initiated to Gordon and that Gordon received in Manhattan (these lunches, meetings and phone conversations hereinafter referred to collectively as the "November 2013 Communications").

23. During the November 2013 Communications, Dingman made various material misrepresentations to Gordon to induce Gordon to invest in OWH and/or its purported subsidiaries.

24. During the November 2013 Communications, Dingman represented to Gordon that OWH was the parent company of his other Bahamian businesses, owning 100% of the shares of his other companies. Dingman represented to Gordon that OWH's purported subsidiaries were operating at a profit and that each, with one exception, was cash positive. Drawing on a piece of paper during one lunch at Le Bilboquet, Dingman further represented to Gordon the financial position of OWH and its purported subsidiaries. Dingman stated to Gordon

4

that his shares would be registered with the appropriate Bahamian authorities. Dingman also advised Gordon that any investment in OWH or any of its purported subsidiaries, would be in consideration for a proportionate equity stake in OWH. Each of these representations was false.

25. Upon information and belief, at the time Dingman made these representations to Gordon, OWH did not own any of Dingman's other hospitality businesses. In fact, upon information and belief, OWH had no assets at all.

26. During the November 2013 Communications, Dingman further represented to Gordon that Dingman personally had invested significant sums -- at least $600,000 in cash and other in-kind contributions -- in OWH, giving Gordon the impression that OWH was already well-capitalized. This representation was false. Upon information and belief, Dingman had invested little (if any) of his own capital in OWH.

27. In addition to telling Gordon that his investments in OWH and/or its purported subsidiaries would earn him equity shares in OWH, during the November 2013 Communications, Dingman represented that, upon completion of Gordon's planned investment schedule, Gordon and Dingman would each be equal owners of the entirety of OWH's equity, except for the sweat equity stake to be held by Giunta. This representation was false. Upon information and belief, Dingman already had promised equity stakes to others.

28. During the November 2013 Communications, Dingman repeatedly told Gordon that, should Gordon be dissatisfied in any way with the direction or performance of OWH, Dingman would fully refund Gordon's investment and that Dingman could keep OWH and its purported subsidiaries funded through his own capital. He further promised that if he and Gordon could not come to an agreement on a written document memorializing the terms of Gordon's investment, Dingman would refund Gordon's investment.

29. During the November 2013 Communications, Dingman offered -- and Gordon accepted -- that Gordon would invest capital in OWH and/or its subsidiaries in exchange for a fifty percent equity stake in OWH.

30. On November 22, 2013, and in reliance on his agreement with Dingman, Gordon wired $100,000 from his personal bank account in New York to an account to which Dingman directed Gordon.

31. In an acknowledgment letter on OWH letterhead that Dingman sent to Gordon, Dingman made the following representations: "This letter is to acknowledge the receipt of 3 wires in the total amount $100,000.00 USD made out to Traveller's Restaurant. Out West Hospitality, Ltd intends to use the funds to purchase material and general operations. The investment will represent a 10 percent stake in the holding company of Out west Hospitallity [sic]. We appreciate your support and investment in the holding company."

32. Upon information and belief, these representations were false, among other reasons, because (i) OWH did not own Traveller's and had not issued or registered shares to anyone other than Dingman and/or his agents and (ii) Gordon's funds were not used exclusively to purchase material and fund general operations of OWH, but rather, were used towards Dingman's other business and personal expenses.

33. On or about December 17, 2013, Gordon wired $150,000 from his personal bank account in New York to an account to which Dingman directed Gordon. In an acknowledgment letter on OWH letterhead that Dingman sent to Gordon, Dingman made the following representations: "This letter is to acknowledge the receipt of 2 wires in the total amount $150,000.00 USD made out to Traveller's Restaurant. Out West Hospitality, Ltd intends to use the funds to purchase of The Beach House and general operations. The investment will represent

a[nother] 10 percent stake in the holding company of Out west Hospitallity [sic]. January 15th the company will issue shares that will represent a total investment of 250,000 USD. We appreciate your support and investment in the holding company."

34. Upon information and belief, these representations were false, among other reasons, because (i) OWH did not own Traveller's and had not issued or registered shares to anyone other than Dingman and/or his agents, (ii) Gordon's funds were not used exclusively to purchase material and fund general operations of OWH, but rather, were used towards Dingman's other business and personal expenses and (iii) OWH never issued shares to Gordon.

35. From in or about January 2014 through in or about April 2014, Dingman and Gordon continued to meet regularly for lunch in Manhattan. During these lunches, Dingman continued to repeat and reiterate his misrepresentations from the November 2013 Communications, including, but not limited to, that Gordon was the only OWH investor other than Dingman himself and that, following Gordon's multiple investments, Gordon would own fifty percent of OWH, subject to recognition of Giunta's sweat equity interest of ten percent.

36. During this time period, Dingman also made similar misrepresentations in emails to Gordon. For example, in a March 27, 2014 email to Gordon and Dingman's assistant, Dingman wrote: "Erik [Gordon] and I have partnered up in The Bahamas in a fifty/fifty partnership."

37. On or about March 7, 2014, over lunch at the Beverly Hills Hotel in Beverly Hills, California, Dingman asked Gordon to wire $18,000 for him as a personal loan. On or about March 7, 2014, Gordon wired $18,000 from his personal bank account in New York to the payroll company for Traveller's. Dingman never repaid Gordon and falsely told Gordon that he would count the $18,000 toward Gordon's equity in OWH.

38. On or about March 12, 2014, Gordon wired an additional $75,000 as an investment in OWH from his personal bank account in New York to an account to which Dingman directed Gordon.

39. During the period from in or about January 2014 through in or about May 2014, Gordon repeatedly requested that Dingman and OWH provide detailed financial records for OWH and its purported subsidiaries. Dingman failed to provide the requested information.

40. On or about April 22, 2014, OWH's accountant sent an email to Gordon stating that "until I was hired a few months back to structure the group there were no accounting processes in place."

41. When Gordon sought further clarification from Dingman, Dingman emailed Gordon on or about April 22, 2014 and explained, among other things, that "you just have a peter paying paul [sic] situation."

42. On or about April 22, 2014, during a phone call that Dingman initiated to Gordon, Dingman represented to Gordon that there was $140,000 in OWH's bank account. Upon information and belief, OWH did not have its own bank account.

43. In or about May 2014, Giunta terminated his employment with Dingman.

44. On or about September 9, 2014, Dingman wrote a joint letter to all OWH investors informing them that all businesses had been closed. The existence of other equity holders was a surprise to Gordon due to Dingman's prior representations that only Gordon, Dingman and Giunta held equity interests in OWH.

45. In the weeks following Dingman's September 2014 letter to investors, Dingman did not respond to Gordon's phone calls or emails requesting information about OWH's

operations and financials. Dingman also refused to refund Gordon's investment, as Gordon had requested.

**Dingman's Abuse of the Corporate Form Requires Piercing of the Corporate Veil**

46. Upon information and belief, throughout the course of his dealings with Gordon and Giunta, Dingman abused the privilege of doing business in the corporate form by exercising complete domination and control over OWH and Traveller's, treating the companies as his alter egos and using the corporate form to evade and conceal personal liabilities as detailed above.

47. Upon information and belief, all shares of OWH and Traveller's are owned and controlled either by Dingman directly or by Dingman's agents holding the shares for Dingman's sole benefit.

48. Upon information and belief, Dingman directs all operations and controls all the finances of OWH and Traveller's.

49. Upon information and belief, Dingman never opened separate bank accounts for OWH and Traveller's (or the other purported subsidiaries), but instead, used the bank account of Traveller's to hold assets and pay his personal expenses and the expenses of his other hospitality businesses.

50. Upon information and belief, Dingman disregarded the corporate form by transferring assets and liabilities between and among himself, OWH and Traveller's without consideration in order to evade creditors and enrich himself.

51. Upon information and belief, Dingman disregarded the corporate form by utilizing employees of one company in service of his other companies, failing to engage in corporate formalities such as election of directors and maintenance of corporate records, inadequately capitalizing OWH and Traveller's and failing to ensure that OWH and Traveller's had sufficient income and/or assets to meet their liabilities.

52. Upon information and belief, Dingman incorporated OWH and Traveller's, exercised complete domination and control over these companies and abused their corporate forms in order to perpetrate a fraud against Gordon and evade liabilities he incurred to Gordon and Giunta through his solicitation and acceptance of their investments and services based on his material misrepresentations.

53. Piercing the corporate veil is necessary to prevent Dingman from avoiding liability to Gordon and Giunta.

### FIRST CLAIM: <ins>VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT, 15 U.S.C. § 78j(b) and EXCHANGE ACT RULE 10b-5, 17 C.F.R. § 240.10b-5</ins> (By Gordon against James Dingman, OWH and Traveller's)

54. Gordon incorporates by reference the allegations contained in paragraphs 1 through 53 above as if set forth fully herein.

55. Between in or about January 2013 through in or about September 2014, Dingman, on behalf of himself, OWH and Traveller's, with scienter, by use of the means or instrumentalities of interstate commerce or of the mails, in connection with the sale of securities in OWH: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices or courses of business which operated or would operate as a fraud or deceit upon any person.

56. Dingman engaged in the aforementioned conduct during the November 2013 Communications and thereafter by falsely representing, among things, that: (i) OWH was the parent company and 100% owner of Traveller's and other purported subsidiaries; (ii) Dingman was issuing shares of OWH to Gordon worth up to fifty percent of OWH's equity; (iii) Dingman

10

himself had invested in excess of $600,000 in OWH; (iv) OWH and its purported subsidiaries were profitable; (v) Gordon's shares would be registered with the appropriate Bahamian authorities; and (vi) Gordon, Giunta and Dingman were the only equity stakeholders in OWH.

57. Dingman made these material misrepresentations during lunches and meetings with Gordon in Manhattan and on phone calls that Gordon received in Manhattan.

58. These material misrepresentations were made knowingly or recklessly and with scienter and in connection with and for the purpose of inducing Gordon to invest money in order to purchase and own stock in OWH, which qualifies as a "security" under the Securities Exchange Act of 1934.

59. Reasonably relying on these misrepresentations, and as a direct result thereof, Gordon accepted Dingman's offer for the sale of OWH stock in New York and invested money for the purpose of purchasing stock in OWH. Dingman and Gordon therefore incurred irrevocable liability to carry out the sale and purchase of OWH stock in New York.

60. By reason of the activities described above, Dingman violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and the Exchange Act Rule 10b-5, 17 C.F.R. § 240.10b-5.

61. By reason of the activities described above, Gordon was damaged in an amount to be determined at trial but not less than $343,000.

## SECOND CLAIM: ## BREACH OF CONTRACT
**(By Gordon against James Dingman, OWH and Traveller's)**

62. Gordon incorporates by reference the allegations contained in paragraphs 1 through 61 above as if set forth fully herein.

63. Gordon and Dingman entered into a contract in Manhattan pursuant to which Gordon agreed to invest money in OWH and/or its purported subsidiaries and Dingman agreed to convey to Gordon equity shares in OWH.

64. Gordon performed under his contract with Dingman by investing $343,000 in OWH and its purported subsidiaries.

65. Dingman breached his contract with Gordon by failing to, among other things, issue shares in OWH to Gordon or register shares in OWH to Gordon.

66. By reason of Dingman's breach, Gordon has been damaged in an amount to be determined at trial, but no less than $343,000.

## THIRD CLAIM:
## BREACH OF CONTRACT
### (By Giunta and M101 against James Dingman)

67. Giunta incorporates by reference the allegations contained in paragraphs 1 through 66 above as if set forth fully herein.

68. Giunta and Dingman entered into a contract in Manhattan pursuant to which Giunta agreed to provide services to Dingman and Dingman agreed to pay Giunta for said services with compensation and an equity stake in OWH.

69. Giunta performed under the contract by working for Dingman from in or about February 2013 through in or about May 2014.

70. Dingman breached his contract with Giunta by failing to, among other things, pay Giunta amounts he had earned or issue shares in OWH to Giunta.

71. By reason of Dingman's breach, Giunta has been damaged in an amount to be determined at trial.

## FOURTH CLAIM:
## FRAUDULENT INDUCEMENT
### (By Gordon against James Dingman, OWH and Traveller's)

72. Gordon incorporates by reference the allegations contained in paragraphs 1 through 71 above as if set forth fully herein.

73. During the November 2013 Communications and thereafter, Dingman, on behalf of himself, OWH and Traveller's, made material false representations to Gordon including, but not limited to, that: (i) OWH was the parent company and 100% owner of Traveller's and other purported subsidiaries; (ii) Dingman was issuing shares of OWH to Gordon worth up to fifty percent of OWH's equity; (iii) Dingman himself had invested in excess of $600,000 in OWH; (iv) OWH and its purported subsidiaries were profitable; (v) Gordon's shares would be registered with the appropriate Bahamian authorities; and (vi) Gordon, Giunta and Dingman were the only equity stakeholders in OWH.

74. Dingman's representations were false, and Dingman knew them to be false, at the time they were made.

75. Dingman's misrepresentations were material. Gordon would not have entered into the agreement with Dingman had he known the truth behind Dingman's misrepresentations.

76. Dingman made these misrepresentations for the purpose of inducing Gordon to enter into a contract for the purchase of an equity stake in OWH.

77. Gordon reasonably relied upon the truth of Dingman's misrepresentations in agreeing to enter into his contract with Dingman and to invest $343,000 with Dingman for the purchase of an equity stake in OWH and its purported subsidiaries. Gordon relied upon Dingman's misrepresentations to his detriment and ignorance of their falsity.

78. Dingman's misrepresentations directly caused Gordon to enter into the contract with Dingman for the purchase of an equity stake in OWH, thereby injuring Gordon.

79. Accordingly, the contract for the purchase of the equity stake in OWH should be rescinded.

80. In addition, as a direct result of Dingman's fraudulent inducement, Gordon has suffered damages in an amount to be proven at trial, including, but not limited to, the costs of prosecuting this action.

81. Accordingly, Gordon should be awarded damages in an amount to be determined at trial.

### FIFTH CLAIM:
### FRAUD
**(By Gordon against James Dingman, OWH and Traveller's)**

82. Gordon incorporates by reference the allegations contained in paragraphs 1 through 81 above as if set forth fully herein.

83. During the November 2013 Communications and thereafter, Dingman, on behalf of himself, OWH and Traveller's, made material false representations to Gordon including, but not limited to, that: (i) OWH was the parent company and 100% owner of Traveller's and other purported subsidiaries; (ii) Dingman was issuing shares of OWH to Gordon worth up to fifty percent of OWH's equity; (iii) Dingman himself had invested in excess of $600,000 in OWH; (iv) OWH and its purported subsidiaries were profitable; (v) Gordon's shares would be registered with the appropriate Bahamian authorities; and (vi) Gordon, Giunta and Dingman were the only equity stakeholders in OWH.

84. Dingman's representations were false, and Dingman knew them to be false, at the time they were made.

85. Dingman's false representations were material. Gordon would not have entered into the agreement with Dingman or invested in OWH and its purported subsidiaries had he known the truth behind Dingman's misrepresentations.

86. Dingman engaged in a clear and intentional course of conduct to conceal from Gordon the falsity of each of his representations and made his material, false representations with the intent to defraud Gordon.

87. Gordon reasonably relied on Dingman's misrepresentations in agreeing to enter into his contract with Dingman and to invest $343,000 with Dingman for the purchase of an equity stake in OWH and its purported subsidiaries. Gordon relied on Dingman's misrepresentations to his detriment and in ignorance of their falsity.

88. As a direct result of Dingman's misrepresentations and Gordon's reliance, Gordon entered into the agreement with Dingman and was damaged.

89. Accordingly, Gordon's agreement with Dingman is void, in whole or in part, because it was the product of fraud.

90. As a direct result of Dingman's fraud, Gordon has suffered damages in an amount to be proven at trial, including, but not limited to, the costs of prosecuting this action.

92. Accordingly, Gordon should be awarded damages in an amount to be determined at trial.

## DEMAND FOR RELIEF

WHEREFORE, Erik H. Gordon, Ryan Giunta and M101 Group LLC respectfully pray that this Court enter judgment in their favor and against defendants James T. Dingman, Out West Hospitality Ltd. and The Traveller's Beach Restaurant Ltd. as follows:

a) On the First Claim, awarding Gordon damages in an amount to be determined at trial, plus interest to the maximum extent permitted by law, along with Gordon's costs and disbursements in this action, including reasonable attorney's fees;

b) On the Second Claim, awarding Gordon damages in an amount to be determined at trial, plus interest to the maximum extent permitted by law, along with Gordon's costs and disbursements in this action, including reasonable attorney's fees;

c) On the Third Claim, awarding Giunta and M101 damages in an amount to be determined at trial, plus interest to the maximum extent permitted by law, along with their costs and disbursements in this action, including reasonable attorney's fees;

d) On the Fourth Claim, awarding rescission of Gordon's agreement with Dingman, awarding Gordon damages in an amount to be determined at trial, plus interest to the maximum extent permitted by law, along with Gordon's costs and disbursements in this action, including reasonable attorneys' fees;

e) On the Fifth Claim, declaring Gordon's agreement with Dingman void, in whole or in part, awarding Gordon damages in an amount to be determined at trial, plus interest to the maximum extent permitted by law, along with Gordon's costs and disbursements in this action, including reasonable attorneys' fees; and

f) Such other and further relief as this Court may deem just and proper.

**PLAINTIFFS DEMAND A JURY TRIAL ON THEIR CLAIMS.**

Dated: New York, New York
October 7, 2016                **SULLIVAN & WORCESTER LLP**

By: /s/Harry H. Rimm
    Franklin B. Velie
    Harry H. Rimm
    Clark A. Freeman
    1633 Broadway
    New York, New York 10019
    (212) 660-3000

*Attorneys for Plaintiffs*
*Erik H. Gordon, Ryan Giunta*
*and M101 Group LLC*